IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| **INFINITY HEALTH OF ARKANSAS, LLC,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil No. 6:25cv-06075-SOH** |
| **v.** | ) ) | |
| **ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services, | ) ) ) ) ) | |
| **Defendant.** | ) ) ) | |

## <u>PLAINTIFF'S COMPLAINT</u>

COMES NOW, Plaintiff Infinity Health of Arkansas, LLC ("Plaintiff"), by its attorney, files this Original Complaint against Defendant Robert F. Kennedy, Jr., in his capacity as Secretary of the U.S. Department of Health and Human Services ("Defendant"), and would show the Court as follows:

## <u>INTRODUCTION</u>

1.      This is an action concerning judicial review of decisions of the Medicare Appeals Council ("MAC"), over which this Court has jurisdiction under 42 U.S.C. § 405(g).  The decisions set forth below are final decisions of the Secretary of the United States Department of Health and Human Services (the "Secretary").

2.      The Secretary's final decision was in the form of Orders of Medicare Appeals Council Denying Request for Review or Notice of Decision of Medicare Appeals Council, as follows:

      a.  Docket No. M-24-2818, and the OMHA Appeal Number is 3-128396771746; and

      b.  Docket No. M-24-2941, and the OMHA Appeal Number is 3-12925142717.  A true and correct copy of each of the MAC Decisions set forth in paragraphs 2.a. – 2.b., above, is attached hereto collectively as Exhibit 1.

3.      Plaintiff is seeking a reversal of the decisions of the Medicare Appeals Council and that a Fully Favorable reimbursement decision be rendered, as the care provided to the individual beneficiary met all CMS coverage criteria.  For the Notices of Dismissal, Plaintiff is seeking a reversal of the Medicare Appeals Decision and requests that these claims be determined on their merit.

4.      The amount in controversy is more than $1900.00.

5.      Plaintiff has exhausted its administrative remedies.

## THE PARTIES

6.      Plaintiff Infinity Health of Arkansas, LLC is an Arkansas limited liability company with a principal place of business in Lonsdale, Arkansas, in the Western District of Arkansas.  Its members are residents of the State of Arkansas.

7.      Defendant Robert F. Kennedy, Jr. is the current Secretary of the Department of Health and Human Services.  The Secretary can be served by service upon the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201.

8.      Additional service is to be made upon Attorney General Pamela Bondi, United States Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001 and upon civil-process clerk at the United States Attorney's for the Western District of Arkansas, 414 Parker Avenue, Fort Smith, Arkansas 72901.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g) providing for judicial review of any final decision of the Commissioner of Social Security made after hearing.

10.      This Court has personal jurisdiction over Defendant as the current Secretary of the U.S. Department of Health and Human Services.

11.      Venue in this District is proper under 42 U.S.C. §§ 405(g) and 1395ff(b)(1) and 28 C.F.R. § 405.1136(b).

## PROCEDURAL BACKGROUND

12.      Plaintiff provided care to the beneficiaries set forth herein and submitted claims for payment for that care.

13.      For each of the claims at issue herein, Novitas Solutions, Inc., the Medicare Administrative Contractor that covers Arkansas, denied the claim.

14.      Plaintiff timely requested a request for redetermination (the first level of administrative appeals within Medicare) on the claims.

15.      Novitas entered an unfavorable finding on the claims at issue.

16.      Plaintiff timely filed a request for reconsideration with the Qualified Independent contractor (the second level of administrative appeal).

17.      The QIC entered an unfavorable finding on the claims at issue.

18.      Plaintiff timely requested a hearing before an Administrative Law Judge (the third level of administrative appeal).

19.      A hearing was scheduled to be held on each of these matters on March 20, 2024.  The ALJ entered an unfavorable determination.  The ALJ further found

that Plaintiff was liable for the non-covered costs under Section 1879 of the Medicare Act and was not entitled to waiver of the overpayment under Section 1870.

20.    The MAC affirmed the decision of the ALJ.  For each of the Notices of Decision, the Medicare Appeals Council determined that the care rendered was not medically reasonable and necessary.

21.    The MAC Decisions constitute a final determination by the Secretary/Defendant.

22.    This Complaint seeks Court review of all portions of the MAC Decision and the underlying contractor decisions, which state that the Qualified Independent Contractor's decision remains binding.

## BACKGROUND AND FACTS

23.    Review is sought from the MAC Decision.  Plaintiff billed and received payment from Medicare for medical care rendered to multiple Medicare beneficiaries during 2021-2022.  For months, CMS had reimbursed providers for the use of ProText.

24.    For the beneficiaries and dates of service at issue, Plaintiff provided injections of ProText to the beneficiary after careful medical evaluation and diagnosis, and establishing ProText as appropriate medical care for the beneficiary and as meeting the requirements for Medicare coverage under 42 U.S.C. §§1833(e), 1862(a)(1)(A).

25.    ProText is a Human Cellular or Tissue-Based Product (HCT/P) regulated by Food and Drug Administration (FDA) under Section 361 of the Public Health Service Act with applicable regulations at 21 C.F.R. § 1271.

26.    ProText is and has been regulated under Section 361 of the Public Health Services Act since 2020.  Prior to the mid-1990's, all products, including human tissue products, were required to obtain pre-market approval or premarket authorization from the FDA before they could be marketed and sold.  Congress determined, *inter alia*, that certain categories of human tissue products did not need to undergo the rigorous screening that other products do, and such requirements were unnecessary when certain criteria were met.  If those criteria were met, then the product could be marketed and sold without formal approval.  If those criteria were not met, then they would be regulated under Section 351 of the PHS Act and the Food, Drug & Cosmetic Act, which requires FDA Approval.

27.    Ultimately, the Food & Drug Administration was tasked with creating and implementing regulations to govern this statutory change. In 1997, the FDA released guidance entitled *Proposed Approach to Regulation of Cellular and Tissue Based Product*.    *See* https://fda.report/media /70704/Proposed-Approach-to-Regulation-of-Cellular-and-Tissue-Based-Products.pdf.  (the "1997 FDA Guidance").

28.    The FDA explained that it was proposing a new approach to the regulation of human cellular and tissue-based products in light of innovations that enhanced and expanded the use of human cells and tissues.

29.    As of that time, more than 25 years ago, the FDA explained, "[t]issues have long been transplanted in medicine for widespread uses--such as skin replacement after severe burns, tendons and ligaments to repair injuries…." The new dual regulatory framework was designed to ensure that innovation and product

development "could proceed ***unhindered by unnecessary regulation***. At the same time, it would provide physicians and patients with the assurance of safety that the public has come to expect from…medical products overseen by the FDA." *Id.* at 1,7 (emphasis added).

30.    Stated another way, Congress and the FDA made it clear that for HCT/Ps, the requirements of clinical trials and studies and the rigorous requirements of Section 351 and the Food, Drug & Cosmetic Act were unnecessary for certain categories of products, including minimally manipulated structural tissue products utilized for homologous use. The reason for this change was simple – providers and the FDA knew and understood how transplanted tissues would function in the recipient – and there was no need to subject what was already known to "unnecessary regulation."

31.    This new framework provided a tiered approach to cell and tissue regulation, which focused on three areas: (1) preventing unwitting use of contaminated tissues with the potential for transmitting infectious disease; (2) preventing improper handling or processing that might contaminate or damage cells and tissues; and (3) ensuring clinical safety and effectiveness. For those products that have limited public health concerns, the new framework allowed for innovation without an application review process.

32.    The FDA addressed processing concerns and concerns about clinical safety and effectiveness. First, the FDA explained that the level of concern relating to processing is dependent on the following factors: whether the cells or tissues are

more than minimally-manipulated; whether they are used for their normal (homologous) function; whether they are combined with non-cell/non-tissue components; and whether they are used for metabolic function.

33.    Products that are more than minimally-manipulated, used for non-homologous function, combined with non-cell/non-tissue components, and/or used for metabolic function would be subject to more comprehensive regulation than those that met the four criteria. But those products that are minimally manipulated, used for homologous function, do not contain non-cell/non-tissue products, and are not used for metabolic function would be regulated under Section 361 and would not be subject to any type of premarket approval or authorization.

34.    The FDA addressed clinical safety and effectiveness concerns and focused on the same four criteria noted above that became the regulations set forth in 21 C.F.R. Part 1271.  Specifically, the FDA explained that if a product met those four criteria, then there are no concerns about clinical safety and effectiveness. However, if one or more of those criteria were *not* met, then there are clinical and safety concerns that would lead the FDA to require section 351 or FDCA premarketing approval or authorization.  *Id.* at 11, 22.

35.    The FDA explained that cells and tissues used for structural purposes generally raise limited safety concerns beyond adverse local effects, and the determination of effectiveness of structural products is more straightforward than the determination of metabolic products.

36.    Four years after this guidance, the FDA published the final rule

implementing 21 C.F.R. Part 1271.  *See* 66 Fed. Reg. 5447.[1]  In July 2020, the FDA released additional guidance entitled *Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products:  Minimal Manipulation and Homologous Use – Guidance for Industry and Food and Drug Administration Staff. Available at:*  https://www.fda.gov/media/109176/download  (the "July 2020 Guidance").  In the July 2020 Guidance, the FDA provided clarification and its current thinking on the criteria set forth in Part 1271, specifically minimal manipulation and homologous use.  This guidance was intended to facilitate companies' understanding of how those terms applied to their products.  *Id.* at 1.

37.     In the July 2020 Guidance, the FDA explained that "HCT/Ps are defined in 21 CFR 1271.3(d) as articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." *Id.* at 2.  The FDA further stated:

> Although FDA is authorized to apply the requirements in the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Public Health Service Act (PHS Act) to those products that meet the definition of drug, biologic, or device, under this tiered, risk-based approach, ***those HCT/Ps that meet specific criteria or fall within detailed exceptions do***

---

[1] Ironically, Congress and CMS determined that HCT/Ps, like ProText, did not need pre-market authorization or pre-market approval (i.e., clinical trials and studies) to be safely marketed to and used by the general public, which includes Medicare beneficiaries.  In fact, FDA found that such requirements are "unnecessary regulation."  *See* 1997 FDA Guidance. That was based, in large part, on input from the medical community.  Further, it took four more years after that initial guidance for the FDA to issue the final rules found in Part 1271.  66 Fed. Reg. 5448.  And when the final rule was enacted, there was much discussion about general acceptance by the medical community, consideration of questions from the medical community, and the safety and efficacy of these products. *Id.*  Despite those findings from Congress and CMS's sister-agency, CMS is now saying studies are required to show that the use of a structural tissue for homologous use is needed to show that it is not experimental and investigational.

> ***not require premarket review and approval.[2]*** In
> developing the tiered, risk-based approach the agency
> focused on public health and regulatory concerns, including
> how transmission of communicable disease can be
> prevented; what processing controls are necessary to
> prevent contamination that could result in an unsafe or
> ineffective product, and to ***preserve integrity and
> function so that the products will work as they are
> intended; and how clinical safety and effectiveness
> can be assured***.

*Id.* a 2-3 (emphasis added).

38.    In sum, there is a dual regulatory framework required by Congress – drugs and biologics are regulated under Section 351 and the FDCA, and HCT/Ps, like ProText, are regulated under Section 361 of the PHS Act.

39.    An HCT/P is regulated solely under section 361 of the PHS Act and 21 CFR Part 1271 if it meets all of the following criteria (21 CFR 1271.10(a)): 1) the HCT/P is minimally manipulated; 2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; 3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and 4) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function.

40.    If an HCT/P does not meet the criteria set out in 21 CFR 1271.10(a), and

the establishment that manufactures the HCT/P does not qualify for any of the exceptions in 21 CFR 1271.15, the HCT/P will be regulated as a drug, device, and/or biological product under the FD&C Act and/or Section 351 of the PHS Act…and premarket review will be required. *Id.* at 3-4.

41.    The July 2020 FDA Guidance provides that "[a]s defined in 21 CFR 1271.3(f), minimal manipulation means: 1) For structural tissue, processing ***that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement***; 2) For cells or nonstructural tissues, processing that ***does not alter the relevant biological characteristics of cells or tissues***." *Id.* at 4 (emphasis added).  As the FDA had explained more than two decades earlier, if a product is minimally manipulated, then there are no safety and effectiveness concerns, as the FDA and medical community understood how cells and tissues worked in the donor, and if they retained the same characteristics, how they would work in the donor.

42.    Similarly, that guidance also discussed homologous use and provided:

> As defined in 21 CFR 1271.3(c), homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. ***This criterion reflects the Agency's conclusion that there would be increased safety and effectiveness concerns for HCT/Ps that are intended for a non-homologous use, because there is less basis on which to predict the product's behavior, whereas HCT/Ps for homologous use can reasonably be expected to function appropriately (assuming all of the other criteria are also met)***.

*Id.* at 4-5 (emphasis added).

43.    This guidance clarified and reiterated the same position that the FDA took in 1997.  Namely, when the four criteria in Part 1271 are met, HCT/Ps "can reasonably be expected to function appropriately."  As a basic premise, if the FDA, a provider, and/or the public can reasonably expect an HCT/P to function appropriately, they must first understand the basic function of that HCT/P.  As noted in 1997, tissues had already had a long, widespread use in the medical community, and outside of a local adverse reaction, there were no concerns about clinical safety or effectiveness.

44.    As such, the FDA's guidance for more than a quarter of a century removes any question as to acceptance by the medical community (as evidenced by the long, widespread use of HCT/Ps), clinical safety and effectiveness (as evidenced by Part 1271 being enacted to ensure safety and effectiveness and the FDA's acknowledgment of a long, established history of safe use), the non-experimental/non-investigational nature of the HCT/Ps at issue.  Indeed, the FDA, which is one of the foremost science-based agencies in the world, explained that if the four criteria of Part 1271 were met, then both the FDA and the medical community could reasonably expect for those products to function appropriately and knew the outcomes from their use.  If a regulator or provider can expect an HCT/P to "function appropriately" then they must, necessarily understand the function of that product when used with the recipient.  If you know what the product is going to do and how it is going to function, then it is the antithesis of experimental and investigational.

45.    ProText is a structural connective tissue allograft made from Wharton's

jelly or human umbilical cord by Regenative Labs. It is used to replace or supplement damaged, missing, or non-properly functioning tissue at the site of a structural defect.

46.     In 2020, CMS established HCPCS Level II code Q4246 for ProText First, when CMS awarded Q4246 for ProText, it acknowledged the following:[3]

> CoreText and ProText are regulated by the FDA as a human tissue product subject to Section 361 of the Public Service Act and 21 CFR 1271. The products are very similar. Wharton's jelly products have been shown to reduce scarring, fibrosis and adhesions in surgical and wound sites…. Both the products are intended to provide the extracellular matrix needed for the infiltration, attachment and proliferation of cells required for the repair of damaged tissue. *They are typically used for muscle and cartilage tears and help to repair damaged tissue. The products are used for wounds and tissue defects and is applied directly to the defect using a syringe.* The amount used depends on the size of the defect and the clinicians' discretion.

https://www.cms.gov/files/document/2020-hcpcs-application-summary-quarter-1-2020-drugs-and-biologicals-updated-04142020.pdf (Page 63 of 72).

47.     For each of the individual beneficiaries whose care is at issue in this case, Plaintiff's choice of ProText as appropriate medical care was consistent with the homologous use of ProText under Section 361 and in accordance with CMS's establishment of HCPCS code Q4246 for ProText.

48.     For those Medicare beneficiaries identified in the MAC Decisions, Plaintiff submitted claims to Medicare for reimbursement for the care that was

---

[3] For purposes of clarity, Plaintiff acknowledges that the issuance of a Q-code is not a guaranty of payment and has not advanced and is not advancing that argument or otherwise taking that position.

provided.  For the use of ProText and related codes identifying services, there was not a national coverage determination or a local coverage determination that specifically addressed ProText.

49.    As such, for the claims submitted to be reimbursed, certain Medicare coverage criteria had to be met, and that includes showing that the care to be provided was reasonable and necessary and medically necessary, as defined by Medicare.  *See* 42 U.S.C. 1833(e) and 1862(a)(1)(A).

50.    "Medically necessary" has been defined to mean and is generally understood as meaning health care services or supplies that are used to diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine.

51.    Similarly, "reasonable and necessary" requires that the care and items used must be (1) safe and effective, not experimental or investigational, and appropriate.  The term appropriate requires that the care be given to diagnose or treat a condition or to improve the function of a malformed body member in a manner consistent with accepted standards of medicine.  The appropriateness element further requires that the care be furnished in an appropriate setting, ordered and furnished by appropriate personnel, meet but not exceed the needs of the beneficiary, and be at least as effective as a clinically-appropriate alternative.

52.    For the beneficiaries at issue, the Medicare contractors determined and ruled that the care provided, including the use of ProText was not medically reasonable and necessary under the applicable Medicare requirements.  There is no

finding raising any complaint or concerns about the documentation of the care provided, the benefits of that care, or any allegation that the use of ProText failed to satisfy any applicable standard of care.

53.     In each of the Notices of Decision (as set forth in Paragraphs 2.a. – 2.c.) ,the Medicare contractors, the ALJ, and the Medicare Appeals Council improperly, inconsistently, arbitrarily and capriciously denied (and affirmed denials of) claims for the administration of ProText by, among other things:

    a.  Failing to follow Medicare guidelines that state in part that Medicare contractors "shall use the available evidence of general acceptance by the medical community, ***such as*** published original research, in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence based consensus statements, and clinical guidelines."  Medicare Program Integrity Manual, Ch. 13, 13.5.3.  Instead, the MAC ignored the plain meaning of the phrase "such as," which simply introduces a list of non-exclusive examples and applied it as a mandatory exclusive list.  As such, the MAC did not consider all available evidence and further misconstrued the evidence and studies submitted.

    b.  Failing to consider other factors, such as positions taken by professional medical societies, such as the American Academy of Orthopedic Surgeons, wherein the use of structural tissues is not considered standard practice.

    c.  The scientific findings of the FDA regarding widespread use and general acceptance by the medical community that had been in

place and known for decades.

d. Mischaracterizing Plaintiff's position as advancing compliance with FDA regulations as ensuring Medicare coverage and a finding that care was "reasonable and necessary" and "appropriate," when Plaintiff directed contractors, ALJ, and the MAC to the FDA's findings regarding safety and effectiveness, its findings regarding acceptance, its findings regarding whether the care is experimental and investigational, and so forth.

e. Finding that the ALJ erred as a matter of law by not giving substantial deference to all the applicable MPIM requirements or explaining the reason for not doing so, particularly in light of recent decisions from the Supreme Court of the United States.

f. Mischaracterizing Plaintiff's use of ProText as being used to treat conditions when the evidence, including medical records and testimony, made it clear that it was used to improve the function of a malformed body member and/or provide care to an injury (i.e., missing or damaged soft tissue).

g. Throughout the MAC Decisions, the MAC repeatedly stated that Plaintiff used HCT/Ps to "treat orthopedic issues" or to "treat orthopedic conditions."  This is concerning, as the evidence adduced during the ALJ hearing and presented to the MAC stated the exact opposite.  Section 1862 of the Act makes it clear that to be reasonable and necessary, the care provided must used for the diagnosis or treatment of the beneficiary's condition *or* to improve the function of a malformed body member. The evidence adduced through an expert and other evidence, including patient records, made it clear that the HCT/Ps were used to improve the

function of a malformed body member.  Further, the evidence, which was and remains unrefuted, made it clear that Plaintiff did not use HCT/Ps to treat a condition.  Indeed, despite CMS's unsupported contentions regarding Plaintiff's use of the HCT/Ps, the evidence in the administrative record directly refutes such contentions, explained where the charts refuted that evidence, and made it clear that Plaintiff's use was to improve function. That testimony remains unrefuted as of today.  As such, the entirety of the MAC's decision is based on erroneous interpretations of the evidence and positions that were expressly rejected.

h.  The MAC's opinion states that when an item or service does "not meet locally acceptable standards of practice, the healthcare provider or supplier is considered to have known that Medicare payment would be denied….In turn, MCPM guidance establishes that acceptable standards of medicine within the local community are based upon the existence of published literature, a consensus of expert medical opinions, and consultation with medical staff, medical associations, including local medical societies, and other health experts."  However, the evidence presented showed that experts agreed that the use of HCT/Ps met accepted standards of medicine, medical societies, including the American Academy of Orthopedic Surgeons, referred to the use of HCT/Ps as "standard practice," CME classes advocated for the use of the products, private payors routinely paid for the use of HCT/Ps and were continuing to do so as of the date of the ALJ hearing, and that the products were widely used and generally

accepted both locally and nationally and had been for decades (as the FDA recognized and noted in 1997). Again, the MAC's opinion ignored the evidence presented.

i.  The MAC acknowledged that neither the ALJ nor the MAC is bound by CMS program guidance, but they "will give substantial deference to such guidance if applicable to a particular case." MAC Decision at 5. However, the Supreme Court of the United States has rejected this position and *Chevron* deference. Given the errors by the MAC in terms of disregarding facts, advancing positions that are belied by the unrefuted evidence, applying incorrect standards, and ignoring governing law and agency guidance, the MAC Decision is the textbook definition of "arbitrary and capricious," as it is unreasonable, irrational, and made without regard to facts.

a.  The ALJ and the MAC misapplied and distorted FDA guidance that stated that HCT/Ps were not approved for the treatment of any orthopedic condition. The evidence made it clear that Plaintiff used the HCT/Ps at issue for their function and to improve the function of a malformed body member, and it further showed that Plaintiff did not use the HCT/Ps to treat an orthopedic issue or condition.

b.  The MAC further cited to a TDL from CMS to its Medicare contractors that postdated the relevant dates of service at issue by several months. It is unfathomable to hold providers, like Plaintiff, to be responsible for knowing guidance that did not even exist at the time of the dates of service. Indeed, Circuit Courts of Appeals have flatly denied CMS's efforts to apply later-

enacted regulations retroactively, as to do so would violated fundamental notions of due process, such as fair notice.

## COUNT I
### Reversal of Medicare Appeals Council Decisions and Dismissals

54.    The care provided to each of the individual beneficiaries meets the criteria for coverage by CMS in that the care was medically necessary and reasonable and necessary in accordance with CMS guidelines.

55.    Plaintiff has filed four levels of appeal in accordance with CMS regulations, including a Level 1 redetermination with the Medicare Administrative Contractor, a Level 2 reconsideration from the Qualified Independent Contractor (QIC), a Level 3 Administrative Law Judge (ALJ) hearing at the Office of Medicare Hearings and Appeals (OMHA), and a Level 4 appeal to the Medicare Appeals Council.  The decision of the Medicare Appeals Council is a final decision of the Commissioner of Social Security, which permits Plaintiff to now seek judicial review of the decision of the Medicare Appeals Council.

56.    The decisions of the Medicare Appeals Council were in error because contrary to those decisions Plaintiff established that the care provided met CMS guidelines for reimbursement.

57.    Further, the MAC Decisions disregarded controlling law, regulations, and guidance, and, as a result, the MAC Decision is arbitrary and capricious.

58.    Additionally, contrary to controlling regulations, the Medicare Appeals Council did not review the ALJ decision *de novo* (*see* 21 C.F.R. § 405.1108(a)), but rather gave improper deference to the ALJ's decision.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court:

a.    Require the Defendant to file with the Court the complete hearing record before the ALJ, including a transcription of the administrative trial that was recorded and all evidence submitted therewith;

b.    Reverse the decisions of the Medicare contractors and MAC and rule that:

> i.    Plaintiff's use of ProText with the patients at issue were reasonable and necessary, as defined by Medicare, including that such care was safe and effective, was not experimental and investigational, and was appropriate;

> ii.    The care provided by Plaintiff to each of the individual beneficiaries met CMS guidelines and coverage criteria and must be paid by CMS;

c.    Reverse the dismissals for failure to provide notice to the QIC, as the QIC was served, and these claims should be decided on the merits rather than a factually-incorrect procedural basis;

d.    Order Defendant to pay Plaintiff for all services provided to patients identified in this matter, together with pre-judgment and post-judgement interest;

e.    Order Defendant to pay Plaintiff's costs and expenses related to this matter, including, without limitation its attorneys' fees under 28 U.S.C. § 2412(d), or otherwise in the Court's discretion; and

f.    That Plaintiff be granted such other and further relief as the Court may

deem just and proper under the circumstances.

Respectfully submitted,

Andrea L. Kleinhenz (2021216)
WRIGHT, LINDSEY & JENNINGS LLP
3333 Pinnacle Hills Parkway, Suite 510
Rogers, Arkansas 72758
Telephone: (479) 986-0888
Facsimile: (479) 986-8932
E-Mail:  akleinhenz@wlj.com

*Attorneys for Plaintiff*